**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| SHAUN STRICKLAND, | : | |
| | : | Civil No. 21-4141 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Judge Michael M. Baylson |
| DELAWARE COUNTY; THE GEO | : | |
| GROUP, INC.; LEE TATUM, Warden; | : | |
| JOHN CHRISTAKIS, Chief Medical Officer; | : | |
| KRISTEN GRADY, Health Services | : | |
| Administrator; RONALD B. PHILLIPS, DO; | : | |
| JEFF WITHELDER, PA-C, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## AMENDED COMPLAINT

Plaintiff Shaun Strickland has been diagnosed with opioid use disorder ("OUD"), an addictive chronic disease. When he was detained on August 9, 2021 at George W. Hill Correctional Facility, the jail refused to provide him his previously prescribed medication for opioid use disorder ("MOUD"), also called medication-assisted treatment for opioid use disorder ("MAT"), which he has been on since 2010. This denial of medication caused "forced" or involuntary withdrawal for Mr. Strickland, precipitating weeks of nausea, vomiting, diarrhea, anxiety, bone and joint pain, depression, excessive sweating, insomnia, and unrelenting cravings for opioids. The forced withdrawal also caused Mr. Strickland to experience post-acute withdrawal symptoms of irritability, dysphoria, anxiety, depression, cravings, and sleep disturbances for many weeks. This forced withdrawal also increased his risk of relapse, overdose, and overdose death

1

post-release.[1]   Withdrawal is not a treatment for OUD.[2]   Scientific and medical evidence demonstrates that MOUD is the appropriate treatment for OUD.[3]  Mr. Strickland brings this action pursuant to 42 U.S.C. § 1983 for violations of his rights under the Fourteenth Amendment of the United States Constitution; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132; the Rehabilitation Act, 29 U.S.C. § 794; and Pennsylvania professional negligence law.

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)(4).

2.      The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate Mr. Strickland's state law claims.

3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in Delaware County, Pennsylvania, within the Eastern District of Pennsylvania.

## PARTIES

4.      Plaintiff Shaun Strickland is a 40-year-old man who was incarcerated at George W. Hill Correctional Facility in Delaware County, Pennsylvania from about August 9, 2021 to September 22, 2021.

---

[1] American Society of Addiction Medicine, *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder, Focused Update* at 34 (2020). https://www.asam.org/quality-care/clinical-guidelines/national-practice-guideline (last accessed December 15, 2021).
[2] American Society of Addiction Medicine, *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder, Focused Update* (2020) at 34.
[3] *Id.*

5.      Defendant Delaware County is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania.  Delaware County receives federal financial assistance for the operation of George W. Hill Correctional Facility.

6.      Defendant The GEO Group, Inc. ("GEO Group") is a private for-profit correctional management company.  Its principal office is located in Boca Raton, Florida.  GEO Group receives federal financial assistance for the operation of George W. Hill Correctional Facility.

7.      Defendant Lee Tatum was the Warden of George W. Hill Correctional Facility in Delaware County, Pennsylvania.  At all relevant times, Defendant Tatum was acting under color of state law.  Defendant Tatum is sued in his individual capacity.

8.      Defendant John Christakis is the Chief Medical Officer at George W. Hill Correctional Facility in Delaware County, Pennsylvania.   At all relevant times, Defendant Christakis was acting under color of state law.  Defendant Christakis is sued in his individual capacity.

9.      Defendant Kristen Grady is the Health Services Administrator of George W. Hill Correctional Facility in Delaware County, Pennsylvania.  At all relevant times, Defendant Grady was acting under color of state law.  Defendant Grady is sued in her individual capacity.

10.      Defendant Ronald B. Phillips is a licensed Doctor of Osteopathic Medicine employed by GEO Group Inc. and the Medical Director of George W. Hill Correctional Facility in Delaware County, Pennsylvania.  Dr. Phillips is responsible for the care of patients assigned to him, including Mr. Strickland.  Defendant Phillips is sued in his individual capacity.

11.      Defendant Jeff Withelder is a Certified Physician Assistant employed by GEO Group Inc. and works at the George W. Hill Correctional Facility in Delaware County, Pennsylvania.  Defendant Withelder is sued in his individual capacity.

3

**FACTS**

12.    Mr. Strickland was incarcerated at George W. Hill Correctional Facility on or around August 9, 2021 after a traffic stop in which the police arrested him on an out-of-county bench warrant for an alleged failure to appear for a hearing, which most likely related to costs, fines, and/or restitution.

13.    Mr. Strickland is an individual with a disability, opioid use disorder ("OUD"), which, *inter alia,* substantially limits his major life activities of interacting with others, sleeping, thinking, and communicating.

14.    Mr. Strickland has struggled with opioid addiction his entire adult life.

15.    Mr. Strickland recalls starting opioid use with the prescription medication Percocet around the age of 15.

16.    Mr. Strickland's dependence on opioids left him unable to finish high school, a goal he still wants to achieve.

17.    As an adult, his opioid use disorder left him homeless, and unable to maintain employment.

18.    Mr. Strickland has experienced about four incidences of overdose during his twenty-five-year history of opioid use disorder.

19.    From 2000 to 2016, Mr. Strickland made repeated attempts to stop opioid use.

20.    Mr. Strickland started his first substance abuse treatment program in 2010, during which he was started on methadone at 30 mg daily.

21.    Since 2010, Mr. Strickland has attended multiple treatment programs, including in Elkton, MD; Harrisburg, PA; Milton County, PA; Washington Township, PA; and Lansdowne, PA.

22. Throughout Mr. Strickland's struggle with OUD, whenever he was released from jail, he would check himself into a treatment program within a short period of time.

23. In 2016, Mr. Strickland suffered from severe forced withdrawal during a previous incarceration at a county jail which resulted in life-threatening symptoms.

24. During that incarceration, Mr. Strickland was airlifted to a hospital in or around Harrisburg, PA, and placed in a medically induced coma.

25. When Mr. Strickland was in active recovery, he was able to maintain employment in construction, roofing, food service, and retail.

26. Just prior to his incarceration at George W. Hill Correctional Facility, Mr. Strickland had been in treatment for severe opioid dependence at Recovery Centers for America for about 18 months, and was receiving methadone continuously during that time.

27. Each day Mr. Strickland received his methadone, attended group therapy, worked till 6:00 p.m., and then attended group therapy sessions again in the evening.

28. As a result of taking methadone daily without interruption, Mr. Strickland had stable employment, stable housing, and felt hopeful for the future for the first time in his 25-year battle with opioid addiction, when previously his struggle with opioid addiction had been marked by cycles of remission and relapse.

29. Upon entering George W. Hill Correctional Facility, Mr. Strickland informed Mr. Withelder, PA-C and Dr. Phillips that he had opioid use disorder, that he had been in a treatment program at Recovery Centers of America Delaware County Clinic, and that he was receiving a methadone dose of 170 mg daily.

30. He then requested medication for opioid use disorder, specifically methadone.

31.     When Mr. Strickland asked Mr. Withelder for methadone, Mr. Withelder informed him that methadone is given only to pregnant individuals, and that he would instead get medication for detoxing.

32.     If an individual with opioid use disorder is on MOUD, the medical standard of care provides that patient be maintained on MOUD at the same or comparable dose.

33.     If an individual with opioid use disorder is on methadone as treatment for the opioid use disorder, the standard of care provides that the methadone should not be abruptly stopped.

34.     Furthermore, according to the American Society of Addiction Medicine's ("ASAM") guidelines, *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder*, "Opioid withdrawal (i.e. detoxification) on its own without ongoing treatment for opioid use disorder is not a treatment for opioid use disorder."[4]

35.     Similarly, to the extent that withdrawal is medically necessary, ASAM provides that methadone and buprenorphine for opioid withdrawal management is recommended over the abrupt cessation of opioids such as with detoxification protocols.[5]

36.     Mr. Strickland asked Dr. Phillips for methadone, who also informed him that George W. Hill Correctional Facility gives methadone only to pregnant individuals.

37.     Mr. Withelder and Dr. Phillips formulated the care plan for Mr. Strickland, which consisted of Mr. Strickland's forced withdrawal from methadone.

38.     Mr. Strickland was not provided methadone or any other MOUD during his forced withdrawal at George W. Hill Correctional Facility.

---

[4] *Id.* at 35.
[5] *Id.*

39.     Within 24 hours, Mr. Strickland began experiencing withdrawal symptoms of bone and joint pain, aches, vomiting, diarrhea, nausea, anxiety, depression, difficulty concentrating, insomnia, and uncontrollable cravings for opioids.

40.     Mr. Strickland's withdrawal symptoms continued throughout his entire incarceration at George W. Hill Correctional Facility.

41.     Because Mr. Strickland was on a relatively high dose of methadone at 170 mg daily prior to his incarceration, his suffering from withdrawal symptoms was severe and more prolonged.

42.     The forced withdrawal prevented Mr. Strickland from exercising at jail because of fatigue, intense muscle aches and pains, and the psychological effects of lack of motivation, anxiety and dysphoria that result due to the changes in brain chemistry from withdrawal from opioids.

43.     Mr. Strickland had difficulty reading due to lack of concentration, constant cravings for illicit opioids, and a lack of focus that made it difficult to take part in groups or communicate with others.

44.     For the first four weeks of withdrawal, it was difficult to eat even one meal a day because of the constant nausea.

45.     Mr. Strickland requested methadone each time medical staff took his blood pressure during the detox period.

46.     Each time, Mr. Strickland was denied methadone.

47.     During Mr. Strickland's incarceration, medical staff also did not adequately monitor his subjective symptoms (such as insomnia, anxiety, cravings, dysphoria, restlessness,

etc.) and/or failed to document it, especially considering that he was provided 170 mg of methadone prior to incarceration.

48.     On September 3, 2021, Plaintiff's Counsel sent a letter to Defendant Tatum, Defendant Grady, and members of the Delaware County Jail Oversight Board, which described Mr. Strickland's condition and requested that he be immediately provided with methadone to avoid further suffering.

49.     In response, on September 15, 2021, Defendant Grady wrote, "GEO only offers a vivitrol [*sic*] MAT program at George W. Hill at present.  GEO does not offer a methadone MAT program."

50.     Mr. Strickland was released from George W. Hill Correctional Facility on or around September 22, 2021.

51.     Mr. Strickland's period of abstinence from methadone while at George W. Hill Correctional Facility lowered his opioid tolerance and placed him at a heightened risk of relapse, overdose, and death by overdose.

52.     Within about six days of his release, Mr. Strickland returned to Recovery Centers of America.

53.     Due to the interruption in his methadone treatment, Mr. Strickland's methadone dosing regimen had to start over again after he was released on September 22, 2021.

54.     A patient's therapeutic dose of methadone is the amount needed to adequately treat their opioid use disorder, and a patient will likely feel ill effects until they are provided their therapeutic dose.

55.     After not taking methadone, a patient cannot immediately be started on their therapeutic dose but must slowly increase their dose over time.

56.     Previously, it took 10 weeks for the Recovery Centers of America Delaware County Clinic to titrate Mr. Strickland's methadone dose from 130 mg daily to safely reach his therapeutic dose of 170 mg daily.

57.     After his release from his incarceration, Mr. Strickland had to start his dosing regimen at a lower dose than 170 mg.

58.     During this time period, he experienced post-acute withdrawal symptoms of intense cravings, fatigue, lack of motivation, and distress caused by the fear of relapse as he progressed to his therapeutic methadone dose.  He also continued to face a heightened risk of relapse and/or overdose.

59.     Statistics for the period of January 2018 - April 2021 showed that 10,402 individuals committed to George W. Hill Correctional Facility were categorized as having OUD.

60.     Statistics for the same period indicate that methadone was given to between 23 to 37 pregnant individuals until the delivery of the child, and then the individuals were "forced" to withdraw.

61.     All individuals who were not pregnant were "forced" to withdraw upon admission to George W. Hill Correctional Facility, and none received methadone or other MOUD upon admission into the jail.

62.     This means that in a three-year period, 10,402 individuals were "forced" to withdraw from opioids with no access to MOUD during detention.

63.     Withdrawal is not a treatment for OUD.

64.     Defendants' failure to provide methadone or other MOUD medication to Mr. Strickland caused him to suffer forced withdrawal from methadone.

65.    Defendants' refusal to provide Mr. Strickland with MOUD, which is the medical standard of care, disregards the express judgment of his treating physician who placed him on the treatment plan, and also disregards sound medicine, including the broad consensus in the scientific community and.

66.    Defendants have promulgated and enforced a categorical ban on providing methadone treatment to non-pregnant people at the jail.

67.    Defendants Christakis and Grady signed the jail policy which outlines the withdrawal protocols for individuals at George W. Hill Correctional Facility.

**Opioid Use Disorder is Recognized as a Serious Medical Condition Requiring Treatment**

68.    Opioid use disorder ("OUD") is a chronic brain disease.  Symptoms of OUD include uncontrollable cravings for and compulsive use of opioids, decreased sensitivity to opioids, and potentially excruciating withdrawal symptoms.

69.    OUD permanently rewires the brain for addiction.  People with OUD cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the dire consequences of continued use.  Continued use does not indicate a person lacks willpower, but rather is the predictable outcome of chemical changes in the brain that result in uncontrollable cravings.

70.    Opioids are a class of drugs that inhibit pain and cause feelings of pleasure.  Some opioids, such as oxycodone, have accepted medical uses, including managing severe or chronic pain.  Others, such as heroin, are illegal and not used in medicine in the United States.  All opioids, including those prescribed for medical use, are highly addictive.

71.     OUD is progressive, meaning it often becomes more severe over time.  Without effective treatment, patients with OUD are rarely able to control their use of opioids, often resulting in serious physical harm or premature death, including due to accidental overdose.

72.     OUD has been proven to be especially unresponsive to non-medication-based, abstinence-only treatment, which is popular in treating alcoholism, because of the alterations in the brain's biological pathways caused by opioids.

73.     OUD is an epidemic in the United States and a public health crisis.  Since 1999, nearly 841,000 people in the United States have died from opioid overdose.[6]

74.     The current COVID-19 pandemic, which has produced enormous grief, anxiety, and feelings of isolation, has further accelerated these trends.  In the one-year period ending April 2021, the opioid epidemic claimed more than 100,000 lives in the United States — up 28% from the 78,056 deaths in the previous year.[7]  Deaths due to drug overdose had the highest impact on communities of color especially among Black, Asian, and Native Americans.[8]

75.     Today, the Centers for Disease Control's provisional data shows that one American dies every five minutes from an opioid overdose or 265 people a day. [9]

---

[6] Centers for Disease Control, *Drug Overdose Deaths*, *available at* https://www.cdc.gov/drugoverdose/deaths/index.html (last accessed December 10, 2021).
[7] Centers for Disease Control, *Drug Overdose Deaths in the U.S. Top 100,000 Annually*, *available at* https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm (last accessed December 10, 2021).
[8] Kaiser Family Foundation, *Substance Use Issues are Worsening Alongside Access to Care Issues*, August 2021, *available at* https://www.kff.org/policy-watch/substance-use-issues-are-worsening-alongside-access-to-care/ (last accessed December 10, 2021).
[9] Centers for Disease Control, *Drug Overdose Deaths in the U.S. Top 100,000 Annually*, *available at* https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm (last accessed December 15, 2021).

76.     Since 2013, the proliferation of fentanyl and other synthetic opioids — an extremely dangerous class of drug — has been the primary driver of the sharp rise in opioid deaths.[10]

77.     The opioid epidemic has not spared Pennsylvania.  The CDC estimates that there were 5,172 overdose deaths in Pennsylvania in 2020, a 16% increase from 4,444 in 2019.[11]

78.     Like other chronic diseases, OUD often involves cycles of relapse and remission. Rather than a linear progression in which a person reaches abstinence from opioid use once-and-for-all, "successful" recovery from OUD is often characterized by sustained periods of abstinence (refraining from using illicit drugs and MOUD) or "active recovery" (being prescribed MOUD), punctuated by relapses in which the person returns to illicit drug use.

79.     The typical treatment goal for OUD is thus to maximize periods of active recovery and minimize periods of relapse, by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

80.     Forced withdrawal from opioids can cause immediate physical pain for six to eight weeks or longer.

81.     Methadone withdrawal is often particularly prolonged due to the long-acting nature of the drug, and methadone withdrawal typically lasts must longer than withdrawal from other opioids.

---

[10]Centers for Disease Control, *Opioids: Three Waves of Opioid Overdose Deaths*, *available at* https://www.cdc.gov/drugoverdose/images/3-waves-2019.PNG (last accessed December 10, 2021).

[11] Associated Press, *Overall Death Rate rose in 2020 CDC Says,* WHYY, (July 17, 2021), *available at https://whyy.org/articles/pennsylvanias-overdose-deaths-rose-in-2020-cdc-says/* (last accessed September 16, 2021).

82.     Post-acute withdrawal symptoms of methadone withdrawal can continue for weeks to months, and sometimes years.[12]

83.     These longer lasting symptoms are known as post-acute withdrawal syndrome ("PAWS").

84.     Ninety percent of opioid use disorder patients experience post-acute withdrawal symptom, characterized as impairments that can persist for weeks or months and fluctuate in severity.[13] These impairments manifest as "difficulty with cognitive tasks such as learning, problem solving and memory recall, feelings of anxiety, panic, depression, sleep disturbances, obsessive compulsive behaviors, difficulties maintaining social relationships and craving the originally abused substance."[14]

85.     Post-acute withdrawal syndrome can be challenging to deal with, especially after going through detox and then working to resist relapse.[15]

86.     Forced withdrawal also causes a heightened risk of fatal overdose upon re-exposure to even small amounts of opioids.

87.     Drug overdose is the leading cause of death upon release from incarceration. Within the first two weeks after release, the risk of death from overdose is 12.7 times higher than for the general population.[16]

---

[12] UCLA Semel Institute for Neuroscience and Human Behavior (2021), *Post-Acute Withdrawal Syndrome, available at* https://www.semel.ucla.edu/dual-diagnosis-program/News_and_Resources/PAWS (last accessed December 15, 2021).

[13] *Id.*

[14] Id.

[15] *Id.*

[16] Elizabeth Needham Waddell, et al, *Reducing overdose after release from incarceration*, Health & Justice (July 2020) https://healthandjusticejournal.biomedcentral.com/articles/10.1186/s40352-020-00113-7 *available at* (last accessed, December 15, 2021). 2020)https://healthandjusticejournal.biomedcentral.com/articles/10.1186/s40352-020-00113-7 (last accessed, December 15, 2021).

**The Standard of Care for Treatment of Opioid Use Disorder**

88.     Broad consensus in the medical and scientific communities confirms that MOUD, also known as "medication-assisted treatment" ("MAT") is effective — and in fact necessary — to treat opioid use disorder (OUD).

89.     The American Medical Association, the American Society of Addiction Medicine ("ASAM"), the U.S. Department of Health and Human Services, the U.S. Food and Drug Administration ("FDA"), the National Institute on Drug Abuse, the Office of National Drug Control Policy, and the Substance Abuse and Mental Health Services Administration ("SAMHSA") have all endorsed the necessity of MOUD.

90.     SAMHSA has explained that "just as it is inadvisable to deny people with diabetes the medication, they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness."[17]

91.     Although treatment with MOUD typically consists of medication combined with counseling and other behavioral therapies, medication is the primary driver of efficacy.

92.     MOUD decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention.  Treatment retention is crucial for treating OUD because the longer a patient is in treatment, the less likely they are to relapse.[18]

---

[17] Substance Abuse Mental Health Services Administration*, Treatment Improvement Protocol - Medications for Opioid Use Disorder Tip 63* Es-2 (2020),  *available at* https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/PEP20-02-01-006_050820.pdf (last accessed September 15, 2021).

[18] Tyler, S. Oesterle, et al., *Medication-Assisted Treatment for Opioid Use Disorder*.  Mayo Clinic Proceedings, 94(10): 2072-2086 (2019), *available at* https://www.mayoclinicproceedings.org/article/S0025-6196(19)30393-3/fulltext (last accessed December 15, 2021).

93.     Studies have shown that MOUD also decreases the likelihood of criminal activity and infectious disease transmission and improves patients' ability to maintain positive family relationships and employment.

94.     The FDA has approved multiple medications for treating OUD: methadone, buprenorphine, buprenorphine extended release (Sublocade), buprenorphine and naloxone (Suboxone), and naltrexone (Vivitrol).

95.     Not all of these medications are equally effective for every patient.

96.     Studies show that methadone and medications with buprenorphine produce longer-term treatment retention, which is the key to effective MOUD treatment.

97.     There is no recommended time limit for treatment of opioid use disorder with methadone or buprenorphine.[19]

98.     If prescribed, MOUD should be maintained for the patient at comparable levels or doses, and should not be abruptly stopped.

99.     Methadone and buprenorphine are "agonists," which means they activate opioid receptors in the brain to relieve withdrawal symptoms and control cravings.

100.    Methadone is a "full agonist," meaning that it fully activates opioid receptors, resulting in a stronger opioid effect.

101.    Buprenorphine is a "partial agonist," meaning that it partially activates opioid receptors.

---

[19] American Society of Addiction Medicine, *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder, Focused Update* at 12,13 (2020), *available at* https://www.asam.org/quality-care/clinical-guidelines/national-practice-guideline (last accessed December 15, 2021).

102.   The effect of both methadone and buprenorphine is much milder, steadier, and longer lasting than drugs such as heroin, fentanyl, or oxycodone.   Because methadone and buprenorphine bind to the opioid receptors they stimulate, they block the receptors from being stimulated by more powerful agonists — meaning that patients taking methadone and buprenorphine cannot get the same "high" from illicit drugs like heroin and fentanyl.

103.   Because they act on opioid receptors without presenting the same risk of overdose, both methadone and buprenorphine have been designated as "essential medicines" by the World Health Organization.

104.   If an individual is on MOUD, such as methadone, the medical standard of care is to keep the patient on the MOUD.

105.   In addition to being the standard of care for treatment of OUD, use of agonists is also the recommended treatment for withdrawal over the abrupt cessation of opioids, if withdrawal is deemed medically necessary.[20]

106.   Naltrexone (Vivitrol) and methadone are not interchangeable treatments for OUD.

107.   Naltrexone (Vivitrol) is an "antagonist," which means it blocks opioid receptors without activating them, preventing the euphoric effect of opioids, and thus reducing desire for opioids over time.

108.   Naltrexone (Vivitrol) does not relieve withdrawal symptoms, and in fact can trigger acute and severe withdrawal.   That withdrawal is especially severe when a patient has recently taken an opioid agonist or partial agonist.   For that reason, medical standards require patients be

---

[20] *Id.* at 35.

fully withdrawn from opioids before receiving naltrexone — a process that requires not using opioids for anywhere from three to ten days.

109. Studies have shown that naltrexone (Vivitrol) treatment produces substantially poorer outcomes in terms of treatment retention than either methadone or buprenorphine.

110. Forcibly changing a patient who has been successfully using agonist medication (such as methadone) to an antagonist (such as naltrexone (Vivitrol)) is dangerous because it subjects the patient to severe withdrawal.

111. Poor retention outcomes with naltrexone (Vivitrol) place the patient at increased risk of relapse, overdose, and death.

112. Because methadone and buprenorphine are better able than naltrexone (Vivitrol) to keep patients in treatment for longer periods, methadone and buprenorphine are the standard of care for OUD — particularly among patients with severe OUD.

113. As SAMHSA has recognized, treatment for OUD — like treatment for other chronic diseases such as insulin for diabetes — is often lengthy and can require years or be lifelong. There is no maximum recommended duration for treatment of MOUD.

114. Providing MOUD is especially critical in carceral settings, where people with OUD face a dramatically heightened risk of relapse, overdose, and death in the weeks immediately following release.

115. Access to MOUD plays a critical role in reducing death in incarcerated populations and yields positive results in the carceral setting.

**Correctional Best Practices Regarding Treatment of OUD**

116.    In recent years, the U.S. Department of Justice ("DOJ") has consistently taken the position that access to MOUD is required in both carceral settings and court programs.  Repeatedly, DOJ has confirmed that MOUD is the standard of care for treatment of OUD and that denying access to MOUD can constitute unlawful disability discrimination.[21]

117.    Both the National Commission on Correctional Health Care and the National Sheriffs' Association have publicly recognized that forced withdrawal can compromise long-term recovery.[22]

118.    In recommending expanded access in jails and prison to MOUD, including methadone, both the National Commission on Correctional Health Care and the National Sheriffs' Association have emphasized that such access can "[c]ontribut[e] to the maintenance of a safe and secure facility for inmates and staff" and reduce recidivism, withdrawal symptoms, the risk of post-release overdose and death, and disciplinary problems.

119.    As both the National Commission on Correctional Health Care and the National Sheriffs' Association have recognized, "correctional withdrawal . . . actually increases the chances the person will overdose following community release due to loss of opioid tolerance."[23]

120.    Jails and prisons throughout the country also allow incarcerated individuals to continue with MOUD during incarceration.  Examples include Bernalillo County Metropolitan Detention Center (New Mexico), Kings County Jail (Washington State), and Orange County Jail

---

[21] *See* United States Department of Justice Civil Rights Division, Investigation of the Cumberland County Jail, 7 (January 14, 2021), *available at* https://www.justice.gov/crt/case-document/file/1354491/download

[22] Jail Based Medication-Assisted Treatment, *Promising Practices, Guidelines, and Resources for the Field,* National Sheriffs 'Association and National Commission on Correctional Health Care, 2-3 (2018), *available at* https://www.ncchc.org/jail-based-mat (last accessed September 10, 2021).

[23] *Id.* at 9.

(Florida). In October 2021, New York passed a law guaranteeing access to MOUD in jails and prisons in New York. The Rhode Island, Maine, and Vermont Departments of Corrections make MOUD available to all incarcerated people suffering from OUD throughout their entire sentence, even those who were not receiving MOUD before being incarcerated. In November 2019, the Federal Bureau of Prisons issued guidance requiring that all its facilities provide continuing MOUD to people in their custody if it is clinically appropriate.

121. In 2019, the Pennsylvania Department of Corrections started a limited MAT program that does provide methadone, suboxone, and sublocade when individuals qualify.

122. George W. Hill Correctional Facility's own policy in providing methadone to pregnant people with opioid use disorder at the jail demonstrates the feasibility of ensuring access to individuals like Mr. Strickland.

123. Withholding MOUD without a clinical reason to do so is always dangerous, but is especially so for incarcerated individuals with OUD, who are especially likely to relapse and die upon release.

**The Jail Maintains a Blanket Ban on Methadone Treatment for OUD**

124. Defendant Delaware County contracts with GEO Group, a private for-profit company, to manage the operations at George W. Hill Correctional Facility.

125. GEO Group is responsible for managing almost all aspects of operations of George W. Hill Correctional Facility, including the provision of security, activities, and services for detained individuals.

126. Defendant Tatum is or was responsible for overseeing all aspects of the functioning of George W. Hill Correctional Facility, including the provision of medical care, and he has or had rulemaking and policymaking authority regarding the jail.

127. Defendant Christakis is responsible for overseeing the provision of medical care, as well as for setting and enforcing policies relating to the health and medical treatment of those incarcerated at George W. Hill Correctional Facility.

128. Defendant Grady is responsible for policy development and handling problems related to housing, medical care, and access to treatment for people incarcerated at George W. Hill Correctional Facility.

129. George W. Hill Correctional Facility has an official policy or custom of categorically denying methadone treatment for OUD to people in the jail's custody unless they are pregnant.

130. Pursuant to its Vivitrol Medically Assisted Treatment Program Policy, 3.22.19, George W. Hill Correctional Facility provides only one type of MOUD, Vivitrol, and only offers it to those who have less than four months until their projected release date.

131. George W. Hill Correctional Facility offers methadone only to pregnant people who are then forced to suffer from withdrawal after the delivery of the child.

132. George W. Hill Correctional Facility's Policy Medically Supervised Withdrawal and Treatment Policy J-F-04, Effective 3/1/2019, provides that "pregnant inmate care may include referral to an outside agency for methadone maintenance," and that "[p]regnant females who are opiate dependent must not undergo opioid withdrawal or detoxification."

133. The jail's blanket methadone ban applies even if methadone has been prescribed by a physician as a medically necessary treatment.

134. The ban also strips the jail's medical staff of discretion to authorize methadone treatment, fully removing that treatment option without regard to medical necessity.

20

135.    The jail has a Methadone stabilization and Methadone Pick-up Standard Operating Procedure (SOP) demonstrating the feasibility and process for providing methadone.

136.    On February 11, 2021, Defendant Delaware County, through its Jail Oversight Board, passed a resolution calling for the expansion for treatment for incarcerated people with OUD.[24]

137.    In this resolution, Defendant Delaware County acknowledged the ongoing crisis of opioid addiction in Delaware County, and that a significant portion of the population at George W. Hill Correctional Facility at any one time is dealing with an addiction to opioids.[25]

138.    Defendant Delaware County also acknowledged that the Vivitrol pilot program "is altogether inadequate considering the magnitude of the population at GWH [George W. Hill] with OUD and the life-or-death nature of this crisis."[26]

139.    In the resolution, Defendant Delaware County requested that GEO Group expand its intake evaluation process in identifying incarcerated individuals who have OUD, and that GEO Group immediately formulate a plan to treat incarcerated people with OUD.[27]

140.    Defendant Delaware County also specifically requested that the MAT program be expanded to include incarcerated people "for which Suboxone or other forms of MOUD is more appropriate or desired."[28]

141.    Defendants GEO Group, Tatum, Christakis, and Grady are aware of this resolution.

---

[24]  *See* County of Delaware, Commonwealth of Pennsylvania, Jail Oversight Board, Resolution 2021-1:  "Resolution Calling for Expansion of Treatment For Inmates With Opioid Use Disorder," *available at* https://delcopa.gov/departments/prison/pdfs/JOBresolution20201.pdf.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

21

142.    Correctional officials and correctional medical professionals, including Defendants, are aware of the risks of forced detoxification, withdrawal, and the failure to provide MOUD.

143.    At the May 2021 Delaware County Jail Oversight Board meeting, where Defendant Tatum was present, a Jail Oversight Board member noted that a MAT expansion grant had not been utilized and therefore the grant could be lost,[29] indicating that several months after the resolution had passed, no program to provide medication for OUD aside from Vivitrol had been developed or implemented.

144.    Despite Defendant Delaware County's resolution, Delaware County has failed to ensure that MOUD is, in fact, provided to incarcerated people at George W. Hill Correctional Facility.

145.    Despite Defendant Delaware County's resolution, Defendants GEO Group, Tatum, Christakis, and Grady have failed to take proper steps to implement any MOUD or MAT program beyond Vivitrol, causing Plaintiff Strickland and other incarcerated people to suffer from the painful effects of withdrawal and the dire consequences from being denied MOUD.

146.    The denial of Mr. Strickland's prescribed methadone treatment caused him to suffer greatly, both physically and mentally, including but not limited to acute withdrawal for several weeks, and a prolonged period of post-acute withdrawal symptoms during his incarceration and after his release during the weeks necessary to titrate Mr. Strickland's methadone dosage to his pre-incarceration therapeutic levels.

---

[29] *See* Delaware County Jail Oversight Board meeting minutes of May 11, 2021, *available at* https://www.delcopa.gov/departments/prison/pdfs/JOBMay2021Minutes.pdf

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Americans with Disabilities Act**
**(Against Defendant Delaware County)**

147.  Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

148.  Mr. Strickland is a qualified individual with a disability which substantially limits his major life activities.

149.  Defendant George W. Hill Correctional Facility discriminated against and caused Mr. Strickland to be excluded from programs, services, and activities at George W. Hill Correctional Facility, due to his disability, in violation of Title II of the Americans with Disabilities Act.

**COUNT II**
**Violation of the Rehabilitation Act**
**(Against Defendants Delaware County and GEO Group)**

150.  Plaintiff hereby incorporates by reference the allegations contained in each, and every preceding paragraph, as if fully set forth herein.

151.  Mr. Strickland is a qualified individual with a disability which substantially limits his major life activities.

152.  Defendants Delaware County and GEO discriminated against and caused Mr. Strickland to be excluded from participation in programs, services, and activities at George W. Hill Correctional Facility due to his disability, in violation of Section 504 of the Rehabilitation Act.

## COUNT III
### Inadequate Medical Care under the Fourteenth Amendment
### (Against Defendants Delaware County, GEO Group, Lee Tatum, John Christakis, Kristen Grady, Ronald B. Phillips, and Jeff Withelder)

153.    Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth therein.

154.    Defendants' acts and omissions in denying Mr. Strickland MOUD medication were objectively unreasonable, causing an excessive risk to his health and safety.

155.    Defendants were deliberately indifferent to Mr. Strickland's serious medical need, causing him to suffer needlessly and creating a substantial risk of future harm.

## COUNT IV
### Professional Negligence under Pennsylvania Law
### (Against Defendants The GEO Group, John Christakis, Kristen Grady, Ronald Phillips, and Jeff Withelder)

156.    Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth therein.

157.    At all relevant times, the Defendants had a duty to act in accordance with the standard of care required of medical care professionals and to act as a reasonable person would under the same or similar circumstances.

158.    Defendants breached that duty in failing to treat Mr. Strickland's opioid use disorder in accordance with the standard of care.

159.    Defendants' breach of duty is the direct and proximate cause of and a substantial factor in Mr. Strickland's physical and mental suffering.

24

**RELIEF DEMANDED**

WHEREFORE, Plaintiff Shaun Strickland respectfully requests the following relief:

1.      An award of appropriate compensatory damages against Defendants in an amount to be determined by the finder of fact;

2.      An award of appropriate punitive damages against Defendants in an amount to be determined by the finder of fact;

3.      Reasonable attorneys' fees and costs; and

4.      Such other relief the Court deems just and proper.

Respectfully submitted,

/s/ Adrienne R. Abner
Adrienne R. Abner
PA Attorney No. 326750
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304S
Philadelphia, PA 19106
(215) 925-2966
aabner@pailp.org

/s/ Su Ming Yeh
Su Ming Yeh
PA Attorney No. 95111
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304S
Philadelphia, PA 19106
(215) 925-2966
smyeh@pailp.org

*Counsel for Plaintiff*

DATE:  December 16, 2021

25