IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAUN STRICKLAND, <br><br> Plaintiff, <br><br> v. <br><br> DELAWARE COUNTY, et al., <br><br> Defendants. | No. 21-cv-4141 |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

The Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, prohibits jails from denying access to medications for opioid use disorder (OUD) without individually assessing the medical needs of those to whom it is denying access.

Jails provide health care services to those they incarcerate. The ADA requires that people with OUD be given an equal opportunity to benefit from those services. The ADA also requires that jails make reasonable modifications to their policies or practices to avoid discriminating against incarcerated individuals with disabilities. For many individuals with OUD, effective treatment for their disability will include the use of medications approved by the United States Food and Drug Administration (FDA) to treat OUD. Thus, when a jail categorically limits access to OUD medications, without individually assessing whether they may be medically necessary to treat specific individuals with OUD, the jail denies those individuals an equal opportunity to benefit from its healthcare services and violates the ADA.

Plaintiff brought this action alleging Defendants violated his rights under the United States Constitution, the ADA, Section 504 of the Rehabilitation Act, and state professional negligence law, by refusing to provide him with methadone that he had been prescribed to treat

1

his OUD before his incarceration.  Am. Comp. 1-2; ECF No. 47.  Defendants have moved for summary judgment on all of Plaintiff's claims.  ECF No. 67.  Their motion raises the issue of whether and under what circumstances the ADA prohibits jails from denying incarcerated individuals access to OUD medication.

As the agency charged with implementing and enforcing the ADA's obligations pertaining to public entities, 42 U.S.C. §§ 12133-12134, the United States Department of Justice has a strong interest in ensuring the statute's requirements are properly and consistently applied.  The United States therefore respectfully submits this Statement of Interest under 28 U.S.C. § 517[1] to assist the Court with assessing the legal viability of Plaintiff's ADA claim.[2]

For the reasons explained below, the ADA prohibits jails from categorically limiting access to FDA-approved OUD medications without individually assessing whether such medications are medically necessary to treat specific individuals.  Multiple court decisions support this conclusion.  And this undisputed law squarely aligns with broad consensus in the medical community on the effectiveness and importance of providing medication to treat OUD.

I.   **LEGAL FRAMEWORK**

Title II of the ADA prohibits public entities, including States and state agencies, from discriminating based on disability in the provision of their "services, programs, or activities." 42 U.S.C. §§ 12131(1)(A)–(B), 12132.  The phrase "service, program, or activity" includes

---

[1] The Attorney General is authorized "to attend to the interests of the United States" in any case pending in federal court.  28 U.S.C. § 517.

[2] The United States takes no position on the factual disputes between the parties nor is this Statement of Interest intended to address the pertinent legal requirements for any of Plaintiff's other claims except to the extent that this analysis bears on Plaintiff's claim under Section 504 of the Rehabilitation Act.  *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (noting that the ADA and Rehabilitation Act have the same standard for liability and are to be interpreted consistently).

anything a public entity does. *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–12 (1998) (discussing the breadth of Title II's coverage).

Public entities violate Title II when they fail to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from their services, programs, or activities. 28 C.F.R. § 35.130(b)(1)(i)–(iv). Public entities must reasonably modify their policies, practices, and procedures when necessary to avoid discrimination on the basis of disability, unless they can show that doing so would fundamentally alter the nature of the service, program, or activity. *Id.* § 35.130(b)(7)(i). Public entities also may not impose eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered. *Id.* § 35.130(b)(8).

Public entities may impose legitimate safety requirements necessary to safely operate their services, programs, or activities, but only if such requirements "are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.* § 35.130(h). A public entity also may bar an individual from participating in or benefiting from a service, program, or activity if the individual poses a "direct threat to the health or safety of others." *Id.* § 35.139(a). It may only do so, however, if it determines the threat exists after conducting an "individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." *Id.* § 35.139(b).

## II.     ARGUMENT

Title II of the ADA prohibits jails from categorically limiting access to FDA-approved OUD medications without exception.  This is because OUD is typically considered a disability under the ADA.  And for many individuals with OUD, FDA-approved OUD medications are critical to effectively treating their disability.  Accordingly, multiple federal courts have found that a jail likely violates the ADA if it denies someone access to OUD medication without properly assessing their individual circumstances and medical needs.[3]  Defendants' arguments to the contrary defy the plain language of Title II of the ADA and its implementing regulation, conflict with prevailing consensus in the medical community, and invite the Court to reach a conclusion that is out of step with other courts and contrary to the very authority Defendants cite.

### A.     Title II of the ADA Protects the Rights of Individuals with OUD

Title II of the ADA prohibits discrimination on the basis of disability.  42 U.S.C. § 12132.  The ADA defines disability as: (1) a physical or mental impairment that substantially limits one or more major life activities, including major bodily function; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  *Id.* § 12102(1)–(2).

People with OUD typically have a disability because they have a drug addiction—or substance use disorder—that substantially limits one or more of their major life activities.  *See* 28 C.F.R. § 35.108(b)(2) (identifying "drug addiction" as a physical or mental impairment under Title II).  Drug addiction occurs when the repeated use of drugs causes clinically significant impairment, such as health problems or an inability to meet major responsibilities at work, school, or home.  *See* Substance Abuse and Mental Health Servs. Admin. (SAMHSA), *Mental*

---

[3] All courts to address this question have done so in the context of granting requests to preliminarily enjoin jails from denying particular individuals access to OUD medication.  These decisions are discussed further in Section II.C below.

4

*Health and Substance Use Disorders*, https://perma.cc/TDE2-37DA (last visited Nov. 27, 2023). People with OUD may therefore experience a substantial limitation of one or more major life activities, such as caring for oneself, learning, concentrating, thinking, communicating, working, or operation of major bodily functions, including neurological and brain functions. 42 U.S.C. § 12102; 28 C.F.R. § 35.108(c)(1).

Title II's protections do not extend to individuals "currently engaging in the illegal use of drugs" when a public entity "acts on the basis of such use." 42 U.S.C. § 12210; 28 C.F.R. §§ 35.104, .131. But an individual's use of prescribed medication to treat OUD under the supervision of a licensed health care professional is *not* an "illegal use of drugs." 28 C.F.R. § 35.104. And even where an individual with OUD uses illegal drugs in addition to prescribed medication, that does not permit a jail to deny the individual access to their medication. This is because a public entity may not deny access to health services, or services in connection with drug rehabilitation, on the basis of an individual's current illegal use of drugs if the individual is otherwise entitled to such services. 42 U.S.C. § 12210; 28 C.F.R. § 35.131.

> **B.     For Many Individuals with OUD, Medication is Critical to Effectively Treating Their Disability**

The FDA has approved the use of methadone, naltrexone, and buprenorphine to treat OUD. And the Substance Abuse and Mental Health Services Administration (SAMHSA) has comprehensively detailed the broad and well-established consensus in the medical and scientific communities that these medications are necessary for the effective treatment of many individuals with OUD. SAMHSA, *Treatment Improvement Protocol (TIP) 63: Medications for Opioid Use Disorder* (2021), https://perma.cc/CT4T-CHZZ.

According to SAMHSA, all three medications, when appropriately administered to patients for whom they are clinically indicated, can improve patients' health and wellness by:

blunting or blocking the effects of illicit opioids; reducing or eliminating cravings to use opioids; and, for methadone and buprenorphine, reducing or eliminating withdrawal symptoms. *Id.* at 1-3. All three may be ordered by medical providers as part of a comprehensive treatment plan that includes counseling and other behavioral therapies, sometimes called Medication-Assisted Treatment (MAT). *See, e.g.*, SAMHSA, *Medication-Assisted Treatment for Opioid Addiction* (2011), https://perma.cc/W5AF-2XB6.

While all three OUD medications can be effective for certain individuals with OUD, they are not interchangeable; they have different pharmacological properties that elicit different responses from different patients. *See* SAMHSA, *TIP 63*, at 3-10. A medical provider's decision about which OUD medication is appropriate for a particular patient will depend on an individualized assessment of the patient's medical, psychiatric, and substance use histories, their current level of physical dependence on opioids, their prior responses to medication, their occupation, their pregnancy status, and their treatment preferences. *Id.* How long a patient receives OUD medication is also tailored to the needs of each patient and, in some cases, treatment can be indefinite. The best results "occur when a patient receives medication for as long as it provides a benefit," an approach known as "maintenance treatment." *Id.* at 1-8.

SAMHSA cautions that "[a]rbitrary time limits on the duration of treatment with OUD medication are inadvisable." *Id.* If a patient plans to stop use of OUD medication, SAMHSA advises that they and their providers base decisions "on knowledge of the evidence base for the use of these medications, individualized assessments, and an individualized treatment plan they collaboratively develop and agree upon." *Id.* SAMHSA notes that "most patients with OUD who undergo medically supervised withdrawal will start using opioids again and won't continue in recommended care." *Id.* at 1-9. They also are put at heightened risk of opioid overdose. *Id.*

6

The medical and scientific evidence summarized in SAMHSA's TIP 63 makes clear that if a jail categorically denies access to even one of the three FDA-approved OUD medications without individually assessing the medical needs of those to whom it is denying access, it will prevent many incarcerated people with OUD from accessing the only medication that will effectively treat their disability.  If a jail refuses to provide *any* FDA-approved OUD medications, and instead puts all individuals with OUD through medically supervised withdrawal, it inflicts even greater harm.  It not only denies those with OUD access to the most effective, evidence-backed treatments available; it increases the likelihood that they will overdose.

As SAMHSA notes, "[t]his doesn't mean that remission and recovery occur only through medication.  Some people achieve remission without OUD medication, just as some people can manage type 2 diabetes with exercise and diet alone.  But just as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is not sound medical practice to deny people with OUD access to FDA-approved medications for their illness" without considering their individualized circumstances and medical needs.  *See* SAMHSA, *TIP 63* at ES-2.

### C. Multiple Federal Courts Have Found that Jails Likely Violate the ADA by Categorically Restricting Access to OUD Medication

Every federal court to consider the question has found that jails likely violate the ADA when they refuse as a matter of policy to provide incarcerated persons access to OUD medication, regardless of their individual circumstances or medical needs.  These courts have concluded that such blanket policies deny access to a jail's programs, services, or activities on the basis of disability.

In *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018), the court held that a county jail had likely violated the ADA by applying its categorical "policy of denying methadone treatment" to the plaintiff without individually assessing his medical needs or considering his physician's recommendation that he be permitted to continue methadone treatment. *Id.* 45-47. While the jail did offer one of the three FDA-approved medications (injectable naltrexone), the court found that "absent medical or individualized security considerations underlying the decision to deny [the plaintiff] access to medically necessary [methadone] treatment," the jail was unlikely to have satisfied its obligations under the ADA. *Id.* at 42, 47.

In *Smith v. Aroostook County*, 376 F. Supp. 3d 146 (D. Me.), *aff'd,* 922 F.3d 41 (1st Cir. 2019), the court similarly ordered a county jail to provide the plaintiff with access to her prescribed buprenorphine. The court held that the jail's general policy of putting individuals through medically supervised withdrawal rather than providing them with OUD medication likely violated the ADA. *Id.* at 158-161. As in *Pesce*, the court noted that the jail's refusal to provide the plaintiff with her prescribed medication disregarded her medical needs and had no valid justification, security or otherwise. *Id.* at 159.

Finally, federal courts have held in two different cases involving a jail in Jefferson County, New York, that the jail's policy of categorically refusing to provide methadone to non-pregnant individuals likely violates the ADA. In *P.G. v. Jefferson County, New York*, No. 5:21-CV-388, 2021 WL 4059409 (N.D.N.Y. Sept. 7, 2021), the court granted a preliminary injunction requiring the jail to provide an incarcerated person access to methadone that his doctor had concluded was medically necessary. *Id.* at *1, *4. Citing *Smith*, the court held that, under the circumstances, the jail's refusal to guarantee the plaintiff's access to methadone "likely violates the ADA." *Id.* at *5. More recently, in *M.C. v. Jefferson County, New York*, No. 6:22-CV-

8

00190, 2022 WL 1541462 (N.D.N.Y. May 16, 2022), the court preliminarily enjoined the jail from denying an entire class of non-pregnant individuals with OUD access to medically necessary OUD medication. The court found there was a substantial likelihood that the plaintiffs would prevail in showing that the jail's refusal to give them access to methadone violated the ADA by denying them equal access to the jail's healthcare services. *Id.* at 4.

The above decisions all support that a jail may violate the ADA by categorically denying individuals access to medication that is medically necessary to treat their OUD.

> D.  **Defendants Misconstrue the ADA's Requirements and Prevailing Medical Guidance on the Treatment of OUD**

In their motion, Defendants do not address the above legal authorities that are directly relevant to Plaintiff's ADA claim. Instead, Defendants cite cases involving constitutional claims. *See* Defs.' Br. at 11-12, *citing, e.g.*, *Holly v. Rapone, et al.*, 476 F. Supp. 226 (E.D. Pa. 1979) (decided before passage of the ADA); and *Mower v. Dauphin Cnty. Prison*, 2005 WL 1322738, CV-05-0909 (M.D. Pa. 2005) (involving only constitutional claims). The most notable of these decisions, *Norris v. Frame*, 585 F.2d 1183 (3d Cir. 1978), predates passage of the ADA but broadly supports that failure to provide an individual with medically necessary OUD medication is unlawful. *See id.* at 1185 (holding that jail may have violated incarcerated individual's constitutional rights by refusing to allow him to continue his methadone treatment).

Defendants' argument that jails can adequately meet the medical needs of all individuals with OUD by putting them through medically supervised withdrawal while categorically denying access to methadone and buprenorphine is similarly unsupported. *See* Defs.' Br. at 14-17. First, the Federal Bureau of Prisons (BOP) does not, as Defendants suggest, endorse or utilize medically supervised withdrawal as a uniformly appropriate treatment for OUD. The 2020 BOP guidance document cited by Defendants explicitly emphasizes that "**TREATMENT OF**

9

**WITHDRAWAL** (the subject of this clinical guidance) should NOT be confused with the **TREATMENT OF SUBSTANCE USE DISORDERS**, sometimes referred to as Medications for Opioid Use Disorders (MOUD)." *See* ECF No. 68, Ex. F at i (emphasis in original). Indeed, more recent BOP Guidance from August 2021 advises that "[m]edications for OUD are appropriate, first-line treatment for many patients." *See* BOP, *Opioid Use Disorder: Diagnosis, Evaluation, and Treatment* (July 2021) at 1, https://perma.cc/7FZU-4QM7.

Second, the National Commission on Correctional Health Care (NCCHC) does not endorse the use of medically supervised withdrawal as a treatment for OUD. NCCHC has expressly affirmed that "[i]ncarcerated people with OUD should not be forced to undergo withdrawal" as it "discourages engagement in community treatment, increases the risk of substance use during incarceration, and increases the risk of death after discharge." *See* NCCHC, *Position Statement: Opioid Use Disorder in Correctional Settings* (March 2021), https://perma.cc/5MSF-XUZM. In this position statement, issued before Plaintiff's incarceration began, the NCCHC noted that a "robust body of evidence has demonstrated the feasibility and benefits of providing MOUD in correctional settings." *Id.* And it recommended that all jails and prisons "ensure that people who are currently receiving MOUD continue to receive it and those not engaged in treatment are offered treatment." *Id.*

More recently, the NCCHC endorsed guidelines by the Bureau of Justice Assistance (BJA) and the National Institute of Corrections (NIC) for how jails should manage substance withdrawal. *See Guidelines for Managing Substance Withdrawal in Jails: A Tool for Local Government Officials, Jail Administrators, Correctional Officers, and Health Care Professionals* (July 2023), https://perma.cc/G3CX-5V2Q. The BJA/NIC guidelines acknowledge, as Defendants assert, that "[m]any jails currently subject individuals to opioid withdrawal by either

10

not offering buprenorphine or methadone treatment or not initiating it in a timely manner." *Id.* at 41. The guidelines make clear, however, that this is inappropriate medical practice, asserting that "[a]ll patients at risk for opioid withdrawal should have rapid access to treatment with these medications." *Id.* at 44.[4]

Finally, Defendants' reliance on the views of Narcotics Anonymous (NA) as an indicator of what treatment is legally or medically appropriate for incarcerated individuals with OUD is inapt. NA is a peer support group that does not claim to have any legal or medical expertise. Even in the brochure cited by Defendants, NA expressly disclaims taking any positions on medical issues, "including medically assisted treatment." *See* ECF 68, Ex. G at 4.

### III. THE DEPARTMENT OF JUSTICE'S WORK TO REMOVE DISCRIMINATORY BARRIERS TO TREATMENT FOR OUD

The United States' submission of this Statement of Interest aligns with its broader efforts to remove barriers to treatment for individuals with OUD, especially within the criminal justice system. The United States has entered into multiple settlements with jails and prisons to increase access to OUD medication, including agreements in the last month with jails in Pennsylvania and Kentucky.[5] It has undertaken enforcement efforts to combat discrimination against individuals

---

[4] Defendants' emphasis on the diagnostic differences between "opioid dependence" and "opioid use disorder" is similarly misguided. While the American Psychiatric Association's diagnostic manual previously distinguished between abuse and dependence for substance-related and addictive disorders (like OUD), the APA's current diagnostic manual combines the criteria for abuse and dependence under a single diagnosis for substance use disorder. *See* American Psychiatric Association, *Substance-Related and Addictive Disorders* (2013) at 1, https://perma.cc/7FED-7QJG. Moreover, as the BJA/NIC guidelines make clear, "[i]ndividuals may be considered at risk for opioid withdrawal even if they do not meet the clinical criteria for an OUD," and jails should ensure that all patients at risk of withdrawal can be treated with buprenorphine and methadone. *See BJA/NIC Guidelines* at 42, 44.

[5] *See Justice Department Secures Agreement from Pennsylvania Jail to Provide Medications for Opioid Use Disorder* (Nov. 30, 2023), https://perma.cc/BMA2-M5XG; *U.S. Attorney's Office Announces Agreement to Ensure Access to Medications for Opioid Use Disorder at Big Sandy*

with OUD in court supervision programs.[6] And it has issued public guidance on the ADA's protections for those with OUD.[7]

## IV.    CONCLUSION

For all the above reasons, the United States requests that the Court consider this Statement of Interest and reject Defendants' contention that jails satisfy their obligations under the ADA by categorically forcing individuals with OUD through withdrawal regardless of their individual circumstances or medical needs. Instead, the Court should adhere to the plain language of Title II of the ADA, the consensus of the medical community, and the reasoning of other federal courts, and find that the ADA prohibits jails from categorically restricting access to OUD medications without individually assessing whether certain individuals with OUD need those medications to effectively treat their disability.

---

*Regional Detention Center* (Dec. 4, 2023), https://perma.cc/6HZY-6WHS. *See also U.S. Attorney Rollins Announces Correctional Facilities Statewide to Maintain All Medications for Opioid Use Disorder* (April 1, 2022), https://perma.cc/JME5-ZCWV; *U.S. Attorney's Office Announces Agreement to Ensure Access to Medications for Opioid Use Disorder at Fayette County Detention Center* (Nov. 8, 2022), https://perma.cc/SF7S-UGZN.

[6] *See United States v. Unified Jud. Sys. of Pa.*, No. 22-cv-00709 (E.D. Pa. filed Feb. 24, 2022), https://www.justice.gov/crt/case/united-states-v-unified-judicial-system-pennsylvania. *See also U.S. Attorney's Office Settles Disability Discrimination Allegations with the Massachusetts Trial Court Concerning Access to Medications for Opioid Use Disorder* (Mar. 24, 2022), https://perma.cc/8ULC-MR4T.

[7] *The ADA and Opioid Use Disorder: Combating Discrimination Against People in Treatment or Recovery* (April 5, 2022), https://www.ada.gov/resources/opioid-use-disorder/.

Respectfully submitted,

| | |
|---|---|
| JACQUELINE C. ROMERO<br>United States Attorney<br>Eastern District of Pennsylvania<br><br>GREGORY B. DAVID<br>Assistant United States Attorney<br>Chief, Civil Division<br><br>CHARLENE KELLER FULLMER<br>Assistant United States Attorney<br>Deputy Chief, Civil Division<br><br>*/s/ Lauren DeBruicker*<br>LAUREN DeBRUICKER<br>Assistant United States Attorney<br>Deputy Chief for Civil Rights, Civil Division<br>United States Attorney's Office<br>Eastern District of Pennsylvania<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106<br>Telephone: 215-861-8492<br>Lauren.DeBruicker@usdoj.gov<br><br>Dated: December 11, 2023 | REBECCA B. BOND<br>Chief<br><br>*/s/ Adam F. Lewis*<br>KEVIN J. KIJEWSKI<br>Deputy Chief<br>ADAM F. LEWIS<br>Trial Attorney<br>Disability Rights Section<br>Civil Rights Division<br>U.S. Department of Justice<br>150 M Street NE<br>Washington, D.C. 20530<br>Telephone: 202-307-0663<br>Adam.Lewis@usdoj.gov<br><br>*Counsel for the United States of America* |

## CERTIFICATE OF SERVICE

      I hereby certify that on this date, I electronically filed the foregoing Statement of Interest with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

                                                */s/ Lauren DeBruicker*
                                                LAUREN DeBRUICKER
                                                Assistant United States Attorney

Dated: December 11, 2023